T.C. Memo. 2000-337


UNITED STATES TAX COURT


ROBERT M. TEMPLE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23071-96.                  Filed November 1, 2000.


Frank R. Bodor, for petitioner.

Carol A. Szczepanik, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined deficiencies and
additions to tax in petitioner's Federal income tax as follows:

|       |            | Additions to tax | | |
|-------|------------|----------------|----------------|------------|
| Year  | Deficiency | Sec. 6651(f)   | Sec. 6653(b)(1) | Sec. 6654(a) |
| 1988  | $26,874    | N/A            | $20,156        | $1,718     |
| 1989  | 29,683     | $22,262        | N/A            | 2,006      |
| 1990  | 25,383     | 19,037         | N/A            | 1,671      |
| 1991  | 7,078      | 5,309          | N/A            | 410        |
| 1992  | 4,572      | 3,429          | N/A            | 200        |

After concessions,[1] the issues for decision are: (1) Whether petitioner had unreported income from veterinary services, the sale of animals, and oil and gas royalties in the years in issue; (2) whether petitioner is liable for additions to tax for fraud under sections 6653(b)(1)[2] and 6651(f); (3) whether petitioner is liable for failure to pay estimated tax under section 6654(a); and (4) whether petitioner is liable for the imposition of a penalty under section 6673 for taking a frivolous and groundless position in these proceedings.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Bristolville, Ohio.

---

[1]Respondent concedes the following amounts of income set forth in the computation of petitioner's gross receipts from veterinary services and the sale of animals in the statutory notice of deficiency: $34,450 in 1988 (see appendix A); $1,815 in 1989 (see appendix B); $1,800 in 1990 (see appendix C); $10,500 in 1991 (see appendix D); and $391 in 1992 (see appendix E).

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

During the years in issue, petitioner and his wife Catherine Temple (Mrs. Temple) lived at 5955 Stroups Hickox Road, Bristolville, Ohio (5955 property). The 5955 property was a country home with more than 300 acres.

During the years in issue, petitioner was a veterinarian, and he operated a veterinary clinic out of his residence. Petitioner performed services as a veterinarian for several clients including Sea World,[3] Anheuser Busch, the Ohio Department of Wildlife, Canton Veterinary Hospital, Educational Zoological Programs, Inc., Constance A. Halle, Robert M. Sabo, and Wendy Arbogast. Petitioner also provided expert testimony for ITT Hartford.

Petitioner also had property located at 5501 Stroups Hickox Road (5501 property). Petitioner used the 5955 and 5501 properties for livestock breeding. Petitioner bred and sold llamas and birds during the years in issue. Petitioner sold llamas or birds to the following customers: John C. or Maria L. Gifford, Kerney L. and Ann R. Martini, Llamas of Michigan, Swan Lake Llamas, Avian Farms, Ronald G. and Carole L. DeRhodes, Sunny Hill Farms, William L. and Maureen F. Crawford, Fish and Feathers Intl., Ronald C. and Lisa Blider, Educational Zoological

---

[3]Anheuser Busch purchased Sea World in 1989.

Programs, Inc.,[4] Robert M. Sabo, Dennis Grodings, Jerome T. and Barbara A. Grone, Timothy L. Charles, William J. and Patricia M. Boever, Mary Z. Reed, and Wendy Arbogast.

During the years in issue, petitioner's gross receipts from services provided as a veterinarian and from the sale of animals were as follows:

| Year | Gross Receipts |
|------|----------------|
| 1988 | [1]$47,750 |
| 1989 | [2]88,404 |
| 1990 | [3]74,360 |
| 1991 | [4]16,059 |
| 1992 | [5]17,880 |
| Total | 244,453 |

[1] See appendix F.
[2] See appendix G.
[3] See appendix H.
[4] See appendix I.
[5] See appendix J.

Approximately half of petitioner's receipts during 1988 were in the form of checks payable to Dr. Temple, while the remaining checks were payable to Plume Enterprises.[5]  Payments in 1989, 1990, 1991, and 1992 were almost exclusively made to Plume Enterprises, except for one check in the amount of $15,500[6] in

---

[4]Purchased a snake.

[5]See appendix F.

[6]All amounts throughout this opinion are rounded to the nearest dollar.

1990,[7] one check in the amount of $600 in 1991,[8] and three checks totaling $1,410 in 1992.[9]

With the exception of one check issued in 1989 and seven checks issued in 1992, all checks payable to Plume Enterprises were deposited in an account with Bank One,[10] account No. 400359855 (Bank One 855 account), held in the name of Plume Enterprises.[11]  Oxford Charter Corp. was listed as trustee on Plume Enterprises' Bank One 855 account.  L. R. Mayer was the executive director of Oxford Charter Corp. during 1987.

Mrs. Temple had signatory authority over the Bank One 855 account, and the monthly bank statements were sent to petitioner's residence.  During the years in issue, Mrs. Temple signed the following checks drawn on Plume Enterprises' Bank One 855 account:

---

[7]See appendix H.  This check was payable to Galingale Llamas and deposited into a Bank One account, account No. 400359863 (Bank One 863 account).  Mrs. Temple had signatory authority over this account.

[8]See appendix I.  This check was payable to Wendy Arbogast but deposited in Plume Enterprises' Bank One account, account No. 400359855 (Bank One 855 account).  Mrs. Temple had signatory authority over this account.

[9]See appendix J.  These checks were payable to Galingale Group and deposited into the Bank One 863 account.  Mrs. Temple had signatory authority over this account.

[10]See appendixes F, G, H, I, and J.

[11]For a period that included June 10, 1988, through Sept. 25, 1992.

| Year | Payee | Amount |
|------|-------|--------|
| 1989 | Lets Go Travel | $240 |
| 1989 | Lets Go Travel | 480 |
| 1989 | Cash | 1,000 |
| 1989 | R&J Auto Services | 404 |
| 1989 | DS.BA | 625 |
| 1990 | R&J Auto Services | 814 |
| 1990 | R&J Auto Services | 169 |
| 1990 | Action Travel | 791 |
| 1990 | Radisson Resort | 497 |
| 1990 | Action Travel | 158 |
| 1990 | Admiral Bendoro | 144 |
| 1990 | Trundle Management[1] | 2,000 |
| 1990 | Trundle Management[2] | 1,500 |
| 1990 | Trundle Management | 500 |
| 1991 | Action Travel | 278 |
| 1991 | Hotel Westcourt | 162 |
| 1991 | Action Travel | 318 |
| 1991 | Action Travel | 296 |
| 1991 | Greenbelt Holiday Inn | 67 |
| 1992 | Control Management Inc. | 400 |
| 1992 | Cash | 391 |
| 1992 | McMeyers & Ford, Inc. | 300 |
| Total | | 11,534 |

[1-2]These checks, totaling $3,500, were deposited in an account with Second National Bank, account No. 1163506106. Mrs. Temple had signatory authority over this account, and monthly bank statements were sent to petitioner's residence.

The one check issued in 1989 that was not deposited into the Bank One 855 account was deposited in another Bank One account, account No. 400359863 (Bank One 863 account). The Bank One 863 account was held in the name of Galingale Group, Oxford Charter Corp., Trustee.[12] L. R. Mayer was the executive director of Oxford Charter Corp. during 1987.

Mrs. Temple had signatory authority over the Bank One 863 account, and during the years in issue, she signed the following

_____

[12]For a period that included June 13, 1988, through Sept. 30, 1992.

checks drawn on that account:

| Year | Payee | Amount |
|------|-------|--------|
| 1988 | Lets Go Travel | $694 |
| 1988 | Bavarian Manor | 50 |
| 1988 | Custom Parrot Network | 10,000 |
| 1988 | Bavarian Manor | 133 |
| 1988 | Sheraton Centre | 531 |
| 1988 | Custom Parrot Network | 3,500 |
| 1988 | Trundle Management[1] | 2,000 |
| 1989 | The Sheraton Greensboro | 512 |
| 1989 | DS.BA | 1,250 |
| 1989 | Lets Go Travel | 724 |
| 1989 | Regal Travel | 138 |
| 1990 | Trundle Management[2] | 2,000 |
| 1990 | Home Centers | 281 |
| 1991 | Trundle Management[3] | 2,000 |
| 1991 | Trundle Management[4] | 2,000 |
| 1991 | Cash | 300 |
| 1991 | Cash | 500 |
| 1992 | Cash | 107 |
| Total | | 26,720 |

[1-4]These checks, totaling $8,000, were deposited in an account with Second National Bank, account No. 1163506106.  Mrs. Temple had signatory authority over this account, and monthly bank statements were sent to petitioner's residence.

The seven checks issued in 1992 that were not deposited in the Bank One 855 account were deposited in an account with Cortland Savings and Banking Co.[13] held in the name of Plume Enterprises.  These checks totaled $8,800, and they were deposited from August to December 1992 in the Cortland Savings account.  Neither petitioner nor his wife was listed as having signatory authority over the Cortland Savings account, but monthly bank statements[14] were sent to their residence, which was also the address listed on the signature card as the account

[13]Account No. 23-043-10.  See appendix J.

[14]For the period beginning Aug. 18 and ending Oct. 30, 1992.

owner's address.

During 1992, the following checks were drawn on the Plume Enterprises' Cortland Savings account:

| Year | Payee | Amount |
|------|-------|--------|
| 1992 | Comfort Suites | $164 |
| 1992 | L. R. Mayer[1] | 125 |
| 1992 | Action Travel | 220 |
| 1992 | Galt House | 386 |
| 1992 | Piccolo Co. | 1,000 |
| 1992 | Control Management, Inc.[2] | 400 |
| 1992 | McMyers & Ford[3] | 300 |
| 1992 | Piccolo Co. | 5,458 |
| Total | | 8,053 |

[1]L. R. Mayer was the executive director of Oxford Charter Corp. during 1987. Oxford Charter Corp. was listed as trustee on Plume Enterprises' Bank One 855 account and for a Plume Enterprises' bank account with Society Bank of Eastern Ohio.
[2]Control Management had a contract with Plume Enterprises with Pritchel & Pritchel as trustee. The agreement stated, in part, that Control Management would establish and maintain bank accounts for Plume Enterprises.
[3]The notation on this check indicates that it is payment for trustee fees.

All the above-listed checks were written between September and December 1992. The two largest checks drawn on the Cortland Savings account, one for $1,000 and the other for $5,458, were payable to Piccolo Co. The check for $1,000 was written on October 29, 1992, and the check for $5,458 was written on December 31, 1992. Piccolo Co. had an account with Second National Bank of Warren,[15] account No. 1163353006 (Second National 006 account).[16]

_____

[15]For a period that included May 2, 1988, through Dec. 29, 1992.

[16]Several substantial deposits were also made into Piccolo's account by Plume Enterprises, drawn on account No. 400359855 and by Trundle Management, drawn on account No. 1163506106. All these deposits were made by checks signed by Mrs. Temple in the
(continued...)

G. Bodor had signatory authority over Piccolo's account with Second National Bank.[17]  During the years in issue, G. Bodor signed the following checks, all of which were drawn on Piccolo Co.'s Second National 006 account:

| Year | Amount | Payee |
|------|--------|-------|
| 1988 | $10,000 | Purfle Co. |
| 1988 | 14,000 | Purfle Co. |
| 1988 | 10,000 | Purfle Co. |
| 1988 | 7,630 | Purfle Co. |
| 1989 | 22,571 | Purfle Co. |
| 1989 | 5,000 | Purfle Co. |
| 1989 | 9,597 | Purfle Co. |
| 1990 | 5,000 | Purfle Co. |
| 1991 | 4,400 | Purfle Co. |
| 1991 | 4,479 | Purfle Co. |
| 1992 | [1]2,000 | Purfle Co. |
| Total | 94,677 | |

[1]This check was issued in 1992 and signed by B. L. Holtzhauer with what appears to be a signature stamp.

The first seven checks listed above, totaling $78,798, were deposited into a Dollar Savings and Trust Co. account, account No. 218-000-827 (Dollar Savings 827 account).  The Dollar Savings 827 account was held in the name of Purfle Co. with Eton Trust

---

[16](...continued)
years 1988-1992.

[17]We note that petitioner's attorney Frank R. Bodor was the taxpayer, along with his wife Gina Bodor, in Bodor v. Commissioner, T.C. Memo. 1993-456, affd. without published opinion 52 F.3d 324 (6th Cir. 1995).  In that case, this Court found that Robert Temple signed checks for an entity created and operated by Mr. and Mrs. Bodor pursuant to a plan to create tiered structures of domestic and foreign trust shell entities to disguise the fact that Mr. and Mrs. Bodor or their minor children still owned property.

Co., Ltd., as trustee.[18]  Both petitioner and Mrs. Temple had signatory authority over the Dollar Savings 827 account.

Mrs. Temple signed checks payable to cash and drawn on the Dollar Savings 827 account during the years in issue as follows:

| Year | Amount |
|------|--------|
| 1989 | $4,000 |
| 1989 | 4,500 |
| 1989 | 4,500 |
| 1989 | 1,500 |
| 1989 | 2,000 |
| 1989 | 2,892 |
| 1989 | 4,833 |
| 1989 | 4,000 |
| 1989 | 4,500 |
| 1989 | 4,000 |
| Total | 36,725 |

In addition to the above-listed checks payable to cash, Mrs. Temple withdrew $5,000 from the Dollar Savings 827 account in the form of a cashier's check payable to petitioner.  Purfle Co. was remitter on another check drawn on a Dollar Savings bank account and payable to petitioner in the amount of $5,000.

The last four checks, listed on the previous page, and drawn on the Second National 006 account, totaled $15,879.  All these checks were deposited into a second bank account with Dollar Savings and Trust Co., account No. 213-593-320 (Dollar Savings 320 account).  The Dollar Savings 320 account was held in the

_____

[18]For a period that included Nov. 22, 1988, through Mar. 15, 1990.

name of Purfle Co. with Eaton Trust Co., Ltd., as trustee.[19]
Both petitioner and Mrs. Temple had signatory authority over this
account.

Mrs. Temple signed checks payable to cash and drawn on the
Dollar Savings 320 account during the years in issue as follows:

| Year | Amount |
|------|--------|
| 1990 | $1,500 |
| 1990 | 500 |
| 1990 | 500 |
| 1990 | 2,500 |
| 1991 | 3,000 |
| 1991 | 2,000 |
| 1991 | 2,000 |
| 1991 | 1,500 |
| 1991 | 200 |
| 1992 | 2,000 |
| 1992 | 2,500 |
| 1992 | 2,000 |
| Total | 20,200 |

On May 26, 1992, B. L. Holtzhauer replaced petitioner and
Mrs. Temple as the person authorized to sign checks on the Dollar
Savings 320 account. The following checks payable to cash were
signed by B. L. Holtzhauer:

| Year | Amount |
|------|--------|
| 1992 | $1,000 |
| 1992 | 1,000 |
| 1992 | 2,045 |
| Total | 4,045 |

On December 7, 1992, the Dollar Savings 320 account was
closed, and the proceeds were deposited into Barclays Bank,
Nassau, Bahamas.

---

[19]For a period that included Mar. 15, 1990, through Dec. 7,
1992.

Prior to February 1985, petitioner was title owner of the 5501 and 5955 properties. On February 28, 1985, petitioner granted his interest in the 5501 and 5955 properties to Black Creek Management Co. with Nassau Life Insurance Co.,[20] Ltd., as trustee[21] by warranty deeds.

Oil and gas drilling sites were located on both the 5501 and 5955 properties. On February 1, 1985, petitioner executed an Exchange of Royalty Interest with Old Labrador Investment Co. with Nassau Life Insurance Co., Ltd., as trustee. The Exchange of Royalty Interest indicates that petitioner granted Old Labrador Investment Co. with Nassau Life Insurance Co., Ltd., as trustee his interest in the oil and gas leases for both properties for a stated consideration of $10. The Exchange of Royalty Interest was recorded in the Trumbull County Recorder's Office on February 28, 1985.

---

[20]Nassau Life Insurance Co. was an entity which assisted taxpayers to avoid the payment and collection of their Federal income taxes. See Boyce v. Commissioner, T.C. Memo. 1990-658, affd. without published opinion 955 F.2d 47 (9th Cir. 1992); see also Para Techs. Trust v. Commissioner, T.C. Memo. 1992-575; and Johnson v. Commissioner, T.C. Memo. 1989-591. Due to illegal activities and a "tax situation", Nassau Life Insurance Co. ceased operations. See Bodor v. Commissioner, T.C. Memo. 1993-456.

[21]The tax mailing address used by Nassau Life Insurance Co. on the warranty deeds was P.M.B. 11 Grand Turk, Turks & Caicos Islands, British West Indies.

On January 25, 1988, Black Creek Management Co. with Nassau Life Insurance Co., Ltd., as trustee granted by warranty deed for a stated consideration of $1 the 5501 and 5955 properties to Trundle Management with Eton Trust Co., Ltd., as trustee[22] by warranty deed.[23]  On the same day, Old Labrador Investment Co. with Nassau Life Insurance Co., Ltd., as trustee, granted for $1 in consideration its royalty interest in the oil and gas leases in both properties to Trundle Management with Eton Trust Co., Ltd., as trustee.

Petitioner and his wife continued to reside at the 5955 property.  Petitioner continued to use the 5501 and 5955 properties for livestock operations and to operate a veterinary clinic.  Petitioner continued to exercise dominion and control over the 5501 and 5955 properties.

Pennzoil Oil and Scavenger Oil paid royalties for use of the oil and gas wells located on both properties during the years in

---

[22]The tax mailing address used by Eton Trust Co., Ltd., on the warranty deeds was Grant Petroleum Building, Providenciales, British West Indies.

[23]The timing of the transfer is similar to the facts in Bodor v. Commissioner, supra.  The taxpayer in that case was Frank R. Bodor.  He is the attorney representing petitioner in the present case.  In Bodor, we found that the taxpayer transferred his interest in eight properties by quitclaim to various foreign entities for which Nassau Life Insurance Co. served as trustee, that due to illegal activities in late 1986 or early 1987, Nassau Life ceased operations, and that Mr. Bodor knew that the problems stemmed from illegal activities and a "tax situation".

issue. Royalty payments from Pennzoil and Scavenger were as follows:

| Year | Royalty Income |
|------|----------------|
| 1990 | [1]$2,789 |
| 1991 | [2]2,199 |
| 1992 | [3]2,203 |
| Total | 7,191 |

[1] See appendix H.
[2] See appendix I.
[3] See appendix J.

With the exception of one deposit, all checks were deposited into an account with the Second National Bank of Warren, account No. 1163506106 (Second National 106 account). The account was held in the name of Trundle Management, Eton Trust Co., Ltd., Trustee.[24] Originally, Mrs. Temple and P. Evans had signature authority over the account. Petitioner's address was listed on the signature card. On July 7, 1992, B. L. Holtzhauer's name was added to the signature card. The address listed as B. L. Holtzhauer's address on the signature card was petitioner's residence. Bank statements were sent to petitioner's residence.

During the years in issue, Mrs. Temple signed checks drawn on the Second National 106 account as follows:

[24]For a period that included June 9, 1988, through Jan. 8, 1993.

| Year | Amount | Payee |
|------|--------|-------|
| 1989 | $500 | Cash |
| 1989 | 500 | Cash |
| 1989 | 312 | DS.BA |
| 1990 | 1,000 | Cash |
| 1990 | 3,450 | Sweda Heating & Cooling |
| 1990 | 1,316 | R. C. Drywall |
| Total | [1]7,078 | |

[1]B. L. Holtzhauer signed one check in the amount of $60, payable to Universal Disposal in 1992.

Petitioner was in the process of remodeling and expanding his personal residence in 1989.

Petitioner made a $5,000 deposit into the Second National 106 account in 1988. The source of the $5,000 deposit was a bank check payable to petitioner drawn from one of the Dollar Savings and Trust accounts.

Petitioner filed Form 1040, U.S. Individual Income Tax Return, for the years 1975 through 1979. Petitioner did not file a Federal income tax return for 1980, and he has not filed a Federal income tax return for any year since 1980.

OPINION

I.  Unreported Income

Petitioner failed to file Federal income tax returns for the years 1988, 1989, 1990, 1991, and 1992. Respondent determined that petitioner was engaged in the business activity of performing veterinary services and selling livestock during those years. Respondent computed petitioner's business gross receipts based on deposits made to bank accounts which petitioner controlled during those years, taking into account transfers and

nontaxable items. Respondent also determined that petitioner received royalty income during the years 1990, 1991, and 1992.

Petitioner does not dispute the existence of the transactions that produced the income that respondent attributes to him. Rather, petitioner argues that the income was received by, and deposited into bank accounts of, valid irrevocable trusts. Petitioner asserts that respondent has improperly imputed gross income received by a trust to petitioner and has improperly failed to recognize the trust as a separate entity. We note, as a preliminary matter, that petitioner did not provide copies of any trust agreements, nor did he or his wife testify at trial.

Section 61(a) provides, in part, that "gross income means all income from whatever source derived, including (but not limited to)" compensation for services, gains derived from dealing in property and royalties. It is fundamental to our system of taxation that income must be taxed to the one who earns it. See Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949); Lucas v. Earl, 281 U.S. 111, 114-115 (1930). Income can be attributed to an individual when the recipient has total control or dominion over the funds and uses the funds for personal purposes. See Davis v. United States, 226 F.2d 331, 334 (6th Cir. 1955); Woods v. Commissioner, T.C. Memo. 1989-611, affd. without published opinion 929 F.2d 702 (6th Cir. 1991).

A.  <u>Veterinarian Services and the Sale of Livestock</u>

Petitioner provided veterinarian services, and he bred and sold animals.  As a result, petitioner received payments by checks totaling $47,750 in 1988,[25] $88,404 in 1989,[26] $74,360 in 1990,[27] $16,059 in 1991,[28] and $17,880 in 1992.[29]  In 1988, checks totaling $11,000 were payable to Dr. Temple, while the remaining checks totaling $36,750 were payable to Plume Enterprises and deposited into the Bank One 855 account.  This account was fashioned as a trustee account, but all funds deposited in the account were based on payments petitioner received for veterinarian services that he provided and from the sale of animals that he sold.  Mrs. Temple had signatory authority over the account.

In 1989, petitioner received checks totaling $88,404 for the services he provided as a veterinarian and from the sale of animals.  Petitioner deposited checks totaling $87,804 in the Bank One 855 account, and the remaining check for $600 in the Bank One 863 account.  Petitioner's spouse, Mrs. Temple, had signatory authority over both accounts.

---

[25]See appendix F.

[26]See appendix G.

[27]See appendix H.

[28]See appendix I.

[29]See appendix J.

In 1990, petitioner received checks totaling $74,360 for the services he provided as a veterinarian and from the sale of animals. Petitioner deposited checks totaling $74,360 into the Bank One 855 account, which Mrs. Temple had signatory authority over.

In 1991, petitioner received checks totaling $16,059 for the services he provided as a veterinarian and from the sale of animals.[30] Petitioner deposited checks totaling $16,059 into the Bank One 855 account, which Mrs. Temple had signatory authority over.

In 1992, petitioner received checks totaling $17,880 for the services he provided as a veterinarian and from the sale of animals. Petitioner deposited checks totaling $7,670 in the Bank One 855 account and checks totaling $1,410 in the Bank One 863 account. Mrs. Temple had signatory authority over both accounts.

Amounts deposited into the Bank One 855 account in the name of Plume Enterprises and the Bank One 863 account in the name of Galingale Group constituted income of petitioner. Petitioner earned the income, he and his wife exercised total dominion and control over those funds, and they expended the funds for their personal expenses. From these two accounts alone, Mrs. Temple

---

[30]One check for $600 was actually made payable to one of petitioner's customers, Wendy Arbogast, but deposited into the Bank One 855 account. See appendix I.

signed checks totaling $38,254[31] for personal items, including cash, travel agencies, hotels, auto services and deposits to other accounts over which she had signatory authority.

The remaining payments received by petitioner in 1992, checks totaling $8,800, from services he provided as a veterinarian and animals that he sold were deposited into the Cortland Savings account between August and December 1992. Neither petitioner nor his wife was listed as having signatory authority over the Cortland Savings account; however, monthly bank statements were sent to petitioner's residence, and the signature card listed petitioner's address as the account owner's address.

During the period from September to December 1992, checks totaling $8,053 were drawn on the Cortland Savings account. A majority of those funds, checks totaling $6,458, were deposited in an account with the Second National Bank of Warren.[32] G. Bodor had signatory authority over the Second National 006 account, and during the years in issue she wrote checks totaling $94,677 and deposited them into one of two Dollar Savings and

---

[31]Consisting of checks totaling $11,534 from the Bank One 855 account and checks totaling $26,720 from the Bank One 863 account.

[32]Additional checks totaling $825 were used to pay L. R. Mayer ($125), Control Management ($400), and McMeyers & Ford ($300). We believe these expenses were incurred, in part, to maintain the appearance of a valid trust arrangement. Most of the remaining funds were spent on travel expenses.

Trust accounts. Petitioner and his wife had signatory authority over both Dollar Savings and Trust accounts.

We find that the $8,800 was earned by petitioner and then funneled through the various accounts as part of petitioner's overall plan to conceal income. Once we view through the layers of nominee accounts through which the funds were channeled, petitioner remained in control of the funds.

B. Royalty Income

A fundamental principle of income tax law is that economic substance prevails over form. See Gregory v. Helvering, 293 U.S. 465 (1935). "When the form of the transaction has not, in fact, altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction." Zmuda v. Commissioner, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). This rule applies regardless of whether the entity has a separate existence recognized under State law and whether, in form, it is a trust, a common-law business trust, or some other form of jural entity. See id.

We find the various transactions which purported to result in a transfer of petitioner's interest in the 5501 and 5955 properties and his royalty interest in those properties to be without economic substance. Petitioner always remained in

possession of the properties, and he continued to control the properties as he had done before the transfers.

Petitioner and his wife continued to live in their residence located on the 5955 property. Petitioner continued to use the properties for livestock breeding, sale of livestock, and operation of a veterinary clinic. Petitioner, regardless of legal title, exercised dominion and control over the properties.

Payments of $7,191 were made for the use of oil and gas wells located on petitioner's properties during the years in issue. With the exception of one check for $1,800, payments totaling $5,391 were deposited into the Second National 106 account. Mrs. Temple had signatory authority over this account, petitioner's address was listed on the signature card, and bank statements were mailed to petitioner's residence.

Mrs. Temple signed checks totaling $2,000 payable to cash in 1989 and 1990 and checks totaling $4,766 in 1990 to contractors from this account. Petitioner was in the process of remodeling and expanding his personal residence in 1989.

The one check for $1,800 that was not deposited in the Second National 106 account was deposited into the Bank One 855 account. Mrs. Temple signed checks totaling $11,534 for personal items including, cash, hotels, several travel agencies, and an automobile service shop drawn on this account.

Petitioner argues that if the income items in appendixes F through J are attributed to him, then respondent has failed to subtract expenses or deductions from petitioner's gross receipts for each year in issue. However, petitioner did not provide any evidence regarding allowable expenses or deductions, and neither petitioner nor his wife testified.

Even in criminal tax evasion cases, where the Government bears the greater burden of proof beyond a reasonable doubt, it is well settled "that evidence of unexplained receipts shifts to the taxpayer the burden of coming forward with evidence as to the amount of offsetting expenses, if any." Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967); see also Franklin v. Commissioner, T.C. Memo. 1993-184. Where the taxpayer has failed to file a return, or his return shows no receipts from a particular activity, then the assumption that he, more readily than respondent, has access to evidence of deductions or other offsetting amounts makes the nonexistence of such amounts a fair presumption, at least as an initial matter and absent a satisfactory explanation of such nonexistence or the production of some probative evidence. See Franklin v. Commissioner, supra.

We hold that petitioner had unreported taxable income of $47,750 in 1988, $88,404 in 1989, $77,149 in 1990, $18,258 in 1991, and $20,083 in 1992. See appendixes F through J.

II.  Additions to Tax for Fraud

The next issue is whether any part of the underpayment of income tax for each year in issue is due to fraud.  Respondent's notice of deficiency determined that petitioner is liable for the addition to tax for fraud imposed under section 6653(b)(1)[33] for the taxable year 1988 and for the addition to tax for fraudulent failure to file under section 6651(f)[34] for the taxable years

_____

[33]Sec. 6653(b)(1) provides, in part:

> SEC. 6653(b) Fraud.--
>
> (1) In General.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

[34]Sec. 6651(f) provides:

> SEC. 6651(f) Increase in Penalty for Fraudulent Failure to File.--If any failure to file any return is fraudulent, paragraph (1) of subsection (a) shall be applied--
>
> > (1) by substituting "15 percent" for "5 percent" each place it appears, and
> >
> > (2) by substituting "75 percent" for "25 percent".

Sec. 6651(a)(1) provides in relevant part:

SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

> (a) Addition to the Tax.--In case of failure--
>
> > (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with

(continued...)

1989, 1990, 1991, and 1992.  Each section imposes an addition to tax equal to 75 percent of the portion of an underpayment that is attributable to fraud.  Because these provisions are analyzed similarly as to the determination of fraudulent intent, we consolidate our discussion of respondent's fraud determinations. See Clayton v. Commissioner, 102 T.C. 632, 653 (1994).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for the years in issue and that some portion of the underpayment is due to fraud.  See sec. 7454(a); Rule 142(b); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).  Consequently, respondent must establish:  (1) Petitioner has underpaid his taxes for each year; and (2) some part of the underpayment is due to fraud.  See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Fraud is the intentional wrongdoing on the part of a taxpayer to evade a tax believed to be owing.  See Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989).  Where fraud is determined for each of several years, respondent's burden applies separately

---

[34](...continued)
regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

for each of the years.  See <u>Drieborg v. Commissioner</u>, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954.

A.  <u>Underpayment of Taxes</u>

Based on the evidence presented and our previous analysis, we find that respondent has clearly and convincingly established that petitioner understated his taxable income by $47,750[35] in 1988, $88,404[36] in 1989, $77,149[37] in 1990, $18,258[38] in 1991, and $20,083[39] in 1992.  Petitioner underpaid his taxes for each year in issue.

B.  <u>Fraudulent Intent</u>

Respondent must prove that a portion of the underpayment is attributable to the fraudulent intent of petitioner.  Fraud is the intentional wrongdoing motivated by a specific purpose to evade a tax known or believed to be owing.  See <u>Stolzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968).  The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  See <u>Gajewski v. Commissioner</u>, 67 T.C. 181,

---

[35]See appendix A or F.

[36]See appendix B or G.

[37]See appendix C or H.

[38]See appendix D or I.

[39]See appendix E or J.

199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

Direct proof of a taxpayer's intent is rarely available; thus, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Any conduct, the likely effect of which would be to mislead or to conceal may establish an affirmative act of evasion. See Spies v. United States, supra at 499.

The courts have relied upon a number of indicia of fraud in deciding whether an underpayment of tax is due to fraud. While no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. See Petzoldt v. Commissioner, supra.

Respondent argues that the following factors or "badges" of fraud are present in this case: (1) A substantial and consistent understatement of income; (2) extensive dealings in cash; (3) use of nominee accounts;[40] (4) failure to cooperate with revenue agents; and (5) petitioner's level of education.

### 1. Substantial and Consistent Understatement of Income

Consistent failure to report substantial amounts of income

---

[40]Use of bank accounts fashioned as trust accounts to conceal assets.

over a number of years is, standing alone, highly persuasive evidence of fraudulent intent. See Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956), affg. T.C. Memo. 1955-31; Reash v. Commissioner, 218 F.2d 954 (6th Cir. 1954), affg. per curiam a Memorandum Opinion of this Court dated Dec. 28, 1953. In this case, there is a substantial and consistent underpayment of tax for each of the years in issue.

### 2. Extensive Dealings in Cash

Dealing in cash to avoid scrutiny of one's finances is a badge of fraud. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Petitioner made numerous and substantial cash transactions during the 5 years in issue.

During the years in issue, Mrs. Temple signed checks payable to cash totaling $59,223 that were drawn on four different accounts, all of which were fashioned as trust accounts. Mrs. Temple was not a named trustee on any of these accounts. For the short period of time that B. L. Holtzauer replaced petitioner and Mrs. Temple on the Dollar Savings 320 account, checks totaling $4,045 were issued payable to cash. The last check issued to cash in the amount of $2,045 was used toward the purchase of a bank check for $2,645. The Dollar Savings 320 account was closed, and the proceeds deposited into an account in Nassau, Bahamas.

Wendy Arbogast was one of petitioner's clients. Ms. Arbogast testified that she had purchased a bird from petitioner for $1,400 but paid $800 of the purchase price in cash. Ms. Arbogast testified that petitioner told her when she started going to him for veterinary services that he preferred cash payments.

### 3. Use of Nominee Accounts

Use of nominees to conceal assets that a taxpayer has unfettered control over is evidence of fraud. See Friedman v. Commissioner, T.C. Memo. 1968-145, affd. 421 F.2d 658 (6th Cir. 1970).

Petitioner received checks from various customers for providing veterinarian services, the sale of animals, and royalties and deposited them into various bank accounts fashioned as trustee accounts. These deposits were derived from income earned by and taxable to petitioner. The accounts were fashioned as trust accounts in an effort by petitioner to disguise the true ownership of the accounts.

### 4. Failure To Cooperate With Revenue Agents

Failure to cooperate with revenue agents during the audit phase of a case is an additional indication of guilty knowledge on a taxpayer's part. See Professional Servs. v. Commissioner, 79 T.C. 888, 933 (1982).

Revenue Agent Gentile conducted the examination of petitioner for the years in issue.  Mr. Gentile testified that as an initial step in his examination of petitioner, he sent petitioner two appointment letters.  However, petitioner did not appear at either appointment and did not provide any books or records during the course of the examination.

5.  Level of Education

A taxpayer's level of education and his prior history of filing proper Federal income tax returns are relevant.  See Stephenson v. Commissioner, 79 T.C. 995 (1982).

Petitioner is a doctor of veterinary medicine.  A person with his level of education should know that he cannot escape liability from income taxation and still enjoy control and dominion over all the income he received by establishing nominee accounts.  Petitioner filed Federal income tax returns for 1975, 1976, 1977, 1978, and 1979.  His filing of proper returns for years prior to the years in issue demonstrates that he was aware of his income tax responsibilities.

C.  Conclusion

The facts and circumstances of this case clearly and convincingly support respondent's determination of fraud for each year in issue.

III.  Additions to Tax for Failure To Pay Estimated Tax

For 1988, 1989, 1990, 1991, and 1992, respondent determined additions to tax for failure to pay estimated tax under section 6654.  If there is an underpayment of estimated tax for any of the years in issue, section 6654(a) imposes an addition to tax equal to the interest rate established under section 6621 applied to the amount of the underpayment for the period of the underpayment.  This addition to tax is mandatory and, unless one of the exceptions in section 6654(e) applies, is imposed regardless of reasonable cause or extenuating circumstances.  See Dodge v. Commissioner, 96 T.C. 172, 183 (1991), affd. on this issue 981 F.2d 350 (8th Cir. 1992); Grosshandler v. Commissioner, 75 T.C. 1, 21 (1980).

The Commissioner's determinations of additions to tax under section 6654 are presumed to be correct, and the taxpayer bears the burden of proving that he is not liable for those additions. See Rule 142(a).  Petitioner did not offer any evidence that he paid estimated tax for 1988, 1989, 1990, 1991, and 1992. Accordingly, we sustain respondent's determination.

IV.  Penalty Pursuant to Section 6673

Under section 6673, this Court may award a penalty to the United States of up to $25,000 when the proceeding has been instituted or maintained by the taxpayer primarily for delay or if the taxpayer's position in such proceeding is frivolous or

groundless.  See sec. 6673.  Based on the record, we conclude that such an award is appropriate in this case.  Petitioner's argument that he can escape liability for income tax by purporting to assign earnings from his personal activities to a series of trusts is frivolous.  Accordingly, a penalty is awarded to the United States under section 6673 in the amount of $5,000.

We have considered all arguments in this case.  Those arguments not discussed herein are without merit or irrelevant.  To reflect the foregoing,

<u>An appropriate order will be issued granting respondent's motion for a penalty, and decision will be entered under Rule 155.</u>

APPENDIX A

1988 Gross Receipts

| As Stated in Notice of Deficiency[1] | | Concessions | Total |
|---|---|---|---|
| Payor | Amount | | |
| Sea World of Ohio | $500 | 0 | $500 |
| Sea World of Ohio | 500 | 0 | 500 |
| Sea World of Ohio | 1,000 | 0 | 1,000 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Swan Lake Llamas | 5,750 | 0 | 5,750 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Society Bank | 5,750 | ($5,750) | 0 |
| Bank One | 200 | (200) | 0 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 5,000 | 0 | 5,000 |
| Jerome T. Grone | 2,500 | 0 | 2,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sunny Hill Farm | 1,500 | 0 | 1,500 |
| John C. Gifford | 100 | 0 | 100 |
| Sunny Hill Farm | 13,500 | 0 | 13,500 |
| Piccolo Company | 10,000 | (10,000) | 0 |
| John C. Gifford | 1,100 | 0 | 1,100 |
| John C. Gifford | 7,300 | 0 | 7,300 |
| Custom Parrot Network | 3,500 | (3,500) | 0 |
| Dollar Bank Cashier Check | 15,000 | (15,000) | 0 |
| Total | 82,200 | (34,450) | 47,750 |

[1]On some checks, more than one party is listed on a payor's check (i.e., John and Maria Gifford).  We note, that in some instances, respondent may list one payor (i.e., John Gifford) as the payor when in fact it was the other party, presumably his spouse (i.e., Maria Gifford) who signed the check.  These differences have no impact on our decision, and for consistency, we use only the name of the party used by respondent in the notice of deficiency throughout these appendixes.

APPENDIX B

1989 Gross Receipts

| As Stated in Notice of Deficiency | | Concessions | Total |
|---|---|---|---|
| Payor | Amount | | |
| Llamas of Michigan | $2,450 | 0 | $2,450 |
| Llamas of Michigan | 22,050 | 0 | 22,050 |
| Dennis Grodings | 900 | 0 | 900 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| John C. Gifford | 9,500 | 0 | 9,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 105 | 0 | 105 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| John C. Gifford | 1,200 | 0 | 1,200 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| State of Ohio | 3,649 | 0 | 3,649 |
| Valley Las Vegas | 1,815 | ($1,815) | 0 |
| Ronald G. DeRhodes | 22,000 | 0 | 22,000 |
| Canton Veterinary Hospital | 5,000 | 0 | 5,000 |
| Sea World of Ohio | 3,000 | 0 | 3,000 |
| Wendy H. Arbogast | 1,800 | 0 | 1,800 |
| Constance A. Halle | 150 | 0 | 150 |
| William C. Crawford | 200 | 0 | 200 |
| William C. Crawford | 1,000 | 0 | 1,000 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Ronald C. Blidar | 1,800 | 0 | 1,800 |
| Ronald C. Blidar | 1,000 | 0 | 1,000 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| John C. Gifford | 600 | 0 | 600 |
| Total | 90,219 | (1,815) | 88,404 |

APPENDIX C

1990 Gross Receipts

| As Stated in Notice of Deficiency | | Concessions | Total |
| --- | --- | --- | --- |
| Payor | Amount | | |
| John C. Gifford | $9,500 | 0 | $9,500 |
| Educational Zoological Programs, Inc. | 100 | 0 | 100 |
| Kerney L. Martini | 8,500 | 0 | 8,500 |
| Scavenger Oil Corp. | 1,800 | ($1,800) | 0 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Kerney L. Martini | 7,500 | 0 | 7,500 |
| Intuit | 2 | 0 | 2 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Educational Zoological Programs, Inc. | 350 | 0 | 350 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,200 | 0 | 1,200 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Wendy H. Arbogast | 200 | 0 | 200 |
| Educational Zoological Programs Inc. | 100 | 0 | 100 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Robert Sabo | 145 | 0 | 145 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Ronald G. DeRhodes | 1,200 | 0 | 1,200 |
| State of Ohio | 728 | 0 | 728 |
| Wendy H. Arbogast | 1,800 | 0 | 1,800 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Robert Sabo | 135 | 0 | 135 |
| Robert Sabo | 210 | 0 | 210 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Educational Zoological Programs, Inc. | 100 | 0 | 100 |
| William Boever | 15,500 | 0 | 15,500 |
| Robert Sabo | 90 | 0 | 90 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 9,000 | 0 | 9,000 |
| Total | [1]76,160 | (1,800) | 74,360 |

[1]In the notice of deficiency, the total is $74,360, however, this appears to be an adding error.

1990 Royalty Income

| Payor | Amount | Concessions | Total |
|-------|--------|-------------|-------|
| Scavenger Oil Corp. | [1]$1,800 | $0 | $1,800 |
| Pennzoil Products | 257 | 0 | 257 |
| Pennzoil Products | 289 | 0 | 289 |
| Pennzoil Products | 443 | 0 | 443 |
| Total | 2,789 | 0 | 2,789 |
| Total Income[2] | 78,949 | (1,800) | 77,149 |

[1]Respondent originally included payment from Scavenger Oil in its computation of petitioner's gross receipts from the sale of animals and for royalty income.  In respondent's concessions, the double counting of this one check was eliminated.  We note that the record is not clear on whether the payment was for the purchase of an animal or for royalty payments.  Nevertheless, it is clear that petitioner received an $1,800 payment from Scavenger Oil in 1990.  Whether the check represents payment for the purchase of an animal or royalty income has no bearing on the outcome of this case.  In either case, it is taxable income to petitioner as ordinary income.
[2]Includes totals from previous page.

APPENDIX D

1991 Gross Receipts

| As Stated in Notice of Deficiency | | Concessions | Total |
|---|---|---|---|
| Payor | Amount | | |
| Robert Sabo | $600 | 0 | $600 |
| Robert Sabo | 70 | 0 | 70 |
| Robert Sabo | 35 | 0 | 35 |
| Fish and Feathers International | 250 | 0 | 250 |
| Robert Sabo | 1,000 | 0 | 1,000 |
| Robert Sabo | 500 | 0 | 500 |
| Bad Film | 10,500 | ($10,500) | 0 |
| Educational Zoological Programs Inc. | 200 | 0 | 200 |
| State of Ohio | 1,000 | 0 | 1,000 |
| Robert Sabo | 35 | 0 | 35 |
| Robert Sabo | 123 | 0 | 123 |
| Avian Farms | 2,750 | 0 | 2,750 |
| Mary Z. Reed | 500 | 0 | 500 |
| Avian Farms | 35 | 0 | 35 |
| ITT Hartford | 595 | 0 | 595 |
| Robert Sabo | 66 | 0 | 66 |
| Avian Farms | 1,000 | 0 | 1,000 |
| Sea World of Ohio | 1,800 | 0 | 1,800 |
| Avian Farms | 1,000 | 0 | 1,000 |
| Mary Z. Reed | 1,500 | 0 | 1,500 |
| Sea World of Ohio | 1,800 | 0 | 1,800 |
| Sea World of Ohio | 1,200 | 0 | 1,200 |
| Total | 26,559 | (10,500) | 16,059 |

1991 Royalty Income

| Payor | Amount | Concessions | Total |
|---|---|---|---|
| Pennzoil Products | $249 | $0 | $249 |
| Pennzoil Products | 209 | 0 | 209 |
| Pennzoil Products | 241 | 0 | 241 |
| Pennzoil Products | 337 | 0 | 337 |
| Pennzoil Products | 217 | 0 | 217 |
| Pennzoil Products | 578 | 0 | 578 |
| Pennzoil Products | 369 | 0 | 369 |
| Total | 2,199 | 0 | 2,199 |
| Total Income[1] | 28,758 | (10,500) | 18,258 |

[1]There is a $1 difference in the totals due to rounding.

APPENDIX E

1992 Gross Receipts

| As Stated in Notice of Deficiency | | Concessions | Total |
|---|---|---|---|
| Payor | Amount | | |
| Educational Zoological Programs, Inc. | $100 | 0 | $100 |
| Anheuser-Busch | 2,000 | 0 | 2,000 |
| Anheuser-Busch | 2,700 | 0 | 2,700 |
| Anheuser-Busch | 1,400 | 0 | 1,400 |
| Timothy L. Charles | 500 | 0 | 500 |
| Anheuser-Busch | 1,400 | 0 | 1,400 |
| Avian Farms | 560 | 0 | 560 |
| Avian Farms | 350 | 0 | 350 |
| Avian Farms | 70 | 0 | 70 |
| Anheuser-Busch | 1,600 | 0 | 1,600 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Cortland Savings Bank | 391 | ($391) | 0 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Anheuser-Busch | 1,200 | 0 | 1,200 |
| Total | 18,271 | (391) | 17,880 |

1992 Royalty Income

| Payor | Amount | Concessions | Total |
|---|---|---|---|
| Pennzoil Products | $155 | $0 | $155 |
| Pennzoil Products | 281 | 0 | 281 |
| Pennzoil Products | 257 | 0 | 257 |
| Pennzoil Products | 332 | 0 | 332 |
| Pennzoil Products | 745 | 0 | 745 |
| Pennzoil Products | 432 | 0 | 432 |
| Total | 2,203 | 0 | 2,203 |
| Total Income[1] | 20,474 | (391) | 20,083 |

[1]There is a $1 difference in the totals due to rounding.

APPENDIX F

1988 Gross Receipts

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Sea World of Ohio | $500 | Dr. Temple | |
| Sea World of Ohio | 500 | Dr. Temple | |
| Sea World of Ohio | 1,000 | Dr. Temple | |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Swan Lake Llamas | 5,750 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Sea World of Ohio | 5,000 | Plume Enterprises | 400359855 |
| Jerome T. Grone | 2,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Dr. Temple | |
| Sunny Hill Farm | 1,500 | Plume Enterprises | 400359855 |
| John C. Gifford | 100 | Plume Enterprises | 400359855 |
| Sunny Hill Farm | 13,500 | Plume Enterprises | 400359855 |
| John C. Gifford | 1,100 | Plume Enterprises | 400359855 |
| John C. Gifford | 7,300 | Plume Enterprises | 400359855 |
| Total | 47,750 | | |

APPENDIX G

1989 Gross Receipts

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Llamas of Michigan | $2,450 | Plume Enterprises | 400359855 |
| Llamas of Michigan | 22,050 | Plume Enterprises | 400359855 |
| Dennis Grodings | 900 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| John C. Gifford | 9,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 105 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| John C. Gifford | 1,200 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| State of Ohio | 3,649 | Plume Enterprises | 400359855 |
| Ronald G. DeRhodes | 22,000 | Plume Enterprises | 400359855 |
| Canton Veterinary Hospital | 5,000 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 3,000 | Plume Enterprises | 400359855 |
| Wendy H. Arbogast | 1,800 | Plume Enterprises | 400359855 |
| Constance A. Halle | 150 | Plume Enterprises | 400359855 |
| William C. Crawford | 200 | Plume Enterprises | 400359855 |
| William C. Crawford | 1,000 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Ronald C. Blidar | 1,800 | Plume Enterprises | 400359855 |
| Ronald C. Blidar | 1,000 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| John C. Gifford | 600 | Galingale Group | 400359863 |
| Total | 88,404 | | |

APPENDIX H

1990 Gross Receipts

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| John C. Gifford | $9,500 | Plume Enterprises | 400359855 |
| Educational Zoological Programs, Inc. | 100 | Plume Enterprises | 400359855 |
| Kerney L. Martini | 8,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Kerney L. Martini | 7,500 | Plume Enterprises | 400359855 |
| Intuit | 2 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Educational Zoological Programs, Inc. | 350 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,200 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Wendy H. Arbogast | 200 | Plume Enterprises | 400359855 |
| Educational Zoological Programs Inc. | 100 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Robert Sabo | 145 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Ronald G. DeRhodes | 1,200 | Plume Enterprises | 400359855 |
| State of Ohio | 728 | Plume Enterprises | 400359855 |
| Wendy H. Arbogast | 1,800 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Robert Sabo | 135 | Plume Enterprises | 400359855 |
| Robert Sabo | 210 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Educational Zoological Programs, Inc. | 100 | Plume Enterprises | 400359855 |
| William Boever | 15,500 | Galingale Llamas[1] | 400359863 |
| Robert Sabo | 90 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 9,000 | Plume Enterprises | 400359855 |
| Total | 74,360 | | |

[1]The deposit slip shows that Galingale Llamas belongs to Galingale Group.

1990 Royalty Income

| Payor | Amount | Payee | Deposited in Account No. |
|-------|--------|-------|--------------------------|
| Scavenger Oil Corp. | $1,800 | Plume Enterprises | 400359855 |
| Pennzoil Products | 257 | Trundle Management Eton Trust Co., Ltd. Trustee[1] | 1163506106 |
| Pennzoil Products | 289 | Trundle Management Eton Trust Co., Ltd. Trustee | 1163506106 |
| Pennzoil Products | 443 | Trundle Management Eton Trust Co., Ltd. Trustee | 1163506106 |
| Total | 2,789 | | |
| Total Income[2] | 77,149 | | |

[1]Petitioner's address is listed as the mailing address for all checks made payable to Trundle Management.
[2]Includes totals from previous page.

APPENDIX I

1991 Gross Receipts

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Robert Sabo | $600 | Wendy Arbogast | 400359855 |
| Robert Sabo | 70 | Plume Enterprises | 400359855 |
| Robert Sabo | 35 | Plume Enterprises | 400359855 |
| Fish and Feathers International | 250 | Plume Enterprises | 400359855 |
| Robert Sabo | 1,000 | Plume Enterprises | 400359855 |
| Robert Sabo | 500 | Plume Enterprises | 400359855 |
| Educational Zoological Programs, Inc. | 200 | Plume Enterprises | 400359855 |
| State of Ohio | 1,000 | Plume Enterprises | 400359855 |
| Robert Sabo | 35 | Plume Enterprises | 400359855 |
| Robert Sabo | 123 | Plume Enterprises | 400359855 |
| Avian Farms | 2,750 | Plume Enterprises | 400359855 |
| Mary Z. Reed | 500 | Plume Enterprises | 400359855 |
| Avian Farms | 35 | Plume Enterprises | 400359855 |
| ITT Hartford | 595 | Plume Enterprises | 400359855 |
| Robert Sabo | 66 | Plume Enterprises | 400359855 |
| Avian Farms | 1,000 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,800 | Plume Enterprises | 400359855 |
| Avian Farms | 1,000 | Plume Enterprises | 400359855 |
| Mary Z. Reed | 1,500 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,800 | Plume Enterprises | 400359855 |
| Sea World of Ohio | 1,200 | Plume Enterprises | 400359855 |
| Total | 16,059 | | |

1991 Royalty Income

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Pennzoil Products | $249 | Trundle Management Eton Trust Co., Ltd., Trustee[1] | 1163506106 |
| Pennzoil Products | 209 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 241 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 337 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 217 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 578 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 369 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Total | 2,199 | | |
| Total Income[2] | 18,258 | | |

[1]Petitioner's address is listed as the mailing address for all checks made payable to Trundle Management.
[2]There is a $1 difference in the totals due to rounding.

APPENDIX J

### 1992 Gross Receipts

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Educational Zoological Programs, Inc. | $100 | Plume Enterprises | 400359855 |
| Anheuser-Busch | 2,000 | Plume Enterprises | 400359855 |
| Anheuser-Busch | 2,700 | Plume Enterprises | 400359855 |
| Anheuser-Busch | 1,400 | Plume Enterprises | 400359855 |
| Timothy L. Charles | 500 | Galingale Group | 400359863 |
| Anheuser-Busch | 1,400 | Plume Enterprises | 400359855 |
| Avian Farms | 560 | Galingale Group | 400359863 |
| Avian Farms | 350 | Galingale Group | 400359863 |
| Avian Farms | 70 | Plume Enterprises | 400359855 |
| Anheuser-Busch | 1,600 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Anheuser-Busch | 1,200 | Plume Enterprises | 23-043-10 |
| Total | 17,880 | | |

### 1992 Royalty Income

| Payor | Amount | Payee | Deposited in Account No. |
|---|---|---|---|
| Pennzoil Products | $155 | Trundle Management Eton Trust Co., Ltd., Trustee[1] | 1163506106 |
| Pennzoil Products | 281 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 257 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 332 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 745 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Pennzoil Products | 432 | Trundle Management Eton Trust Co., Ltd., Trustee | 1163506106 |
| Total | 2,203 | | |
| Total Income[2] | 20,083 | | |

[1]Petitioner's address is listed as the mailing address for all checks made payable to Trundle Management.
[2]There is a $1 difference in the totals due to rounding.